UNITED STATES DISTRICT COURT                    c
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| KAREN JEAN CHANDLER,<br>Plaintiff | CIVIL ACTION NO. 1:18-CV-00225 |
| VERSUS | JUDGE JAMES |
| U.S. COMMISSIONER SOCIAL<br>SECURITY ADMINISTRATION,<br>Defendant | MAGISTRATE JUDGE PEREZ-MONTES |

---

## REPORT AND RECOMMENDATION

Karen Jean Chandler ("Chandler") protectively filed an application for period of disability and Social Security Disability Insurance Benefits ("DIB") under Title II and Part A of Title XVIII on October 20, 2015.  (Doc. 13-1, pp. 158-164).  Chandler alleged a disability onset date of September 16, 2015, due to Crohn's Disease, fibromyalgia, chronic pain disorder, "sleep apnea/sleep disorder," and depression.  Id. at 179-83.   Chandler's claims were initially denied by the Social Security Administration ("SSA") on February 12, 2016.  Id. at 83-95.

Chandler's application was heard before an administrative law judge ("ALJ") on November 4, 2016.  Id. at 39-82.  Chandler appeared with Leonard Francois, a vocational expert ("VE").  Id.  Chandler also appeared with her attorney Yuri Beck. Id.  The ALJ denied Chandler's claim on February 21, 2017.  Id. at 18-34.  The ALJ determined that Chandler was not disabled under the Social Security Act (the "Act"), finding at step five of the sequential evaluation process that she is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  Id. at 21-34.

On December 22, 2017, the Appeals Council denied Chandler's request for review, and the ALJ's February 21, 2017 decision became the final decision of the Commissioner of Social Security (the "Commissioner").  (Doc. 13-1, p. 4).

Proceeding *in forma pauperis*, Chandler filed this appeal for judicial review. (Doc. 1).  Chandler asserts the findings of the Commissioner are not based upon substantial evidence and that improper legal standards were applied.  Id. at 2. Chandler also filed post-decision medical records with this Court.  (Doc. 17, pp. 1-23).

The Commissioner responded. (Doc. 18).  Chandler's appeal is now before the Court for disposition.

## I.    Summary of Pertinent Facts

### A.    Administrative Hearing

At the November 4, 2016 administrative hearing, Chandler testified that she is 44 years old.  (Doc. 13-1, p. 44).  She is 5 feet tall and weighs approximately 230 pounds.  Id.  She resides with her husband and daughter in Dry Prong, Louisiana. Id. at 45.  Chandler has a high school diploma and no additional vocational training or certifications.  Id.  She has never served in the military.  Id.

Chandler last worked in September of 2015 at Heart of Louisiana Credit Union.  Id. at 46.  Chandler had trouble concentrating at work and doing her job.  Id. She was offered a demotion but resigned.  Id.  Chandler worked there for over 20 years.  Id.  For about seven years until 2015, she was an Operations Manager.  Id. at 46-48.  This position required her to work with redesigning a new branch, work with vendors, maintain an ATM at a local business, and oversee the collections

department. Id. at 47. She supervised one employee. Id. at 47-48. Prior to being Operations Manager, Chandler worked for over five years in member services. Id. at 48. She opened accounts and dealt with customers. Id.

Chandler testified she was having diarrhea, stomach pain, and nausea, which caused problems with concentration at work. Id. at 49. She was treated for depression, mood swings, and bipolar disorder. Id. Chandler testified she lost her son in an accident almost three years ago. Id. She attributes a combination of everything affected her ability to focus on things. Id. When offered a demotion to go back to member services, she felt she could not deal with people like before and could not concentrate. Id.

Chandler has not worked since September of 2015 and has not applied for any jobs since that time. Id. Chandler drew unemployment for about five or six months, from the fourth quarter of 2015 through the third quarter of 2016. Id. at 50. She testified she called and asked if there were any openings but did not actually submit any applications. Id. Chandler's husband is their only source of income and they are struggling to maintain. Id. at 50-51.

Chandler has had Crohn's disease for over 20 years which causes her to have severe bouts of diarrhea multiple times a week, nausea, and stomach pain. Id. at 51. It has progressively worsened over time. Id. She has bouts with a perianal fistula from the Crohn's disease which causes problems sitting for periods of time when it flares up. Id. Chandler stated she takes Phenergan when she gets nauseous. Id. at 52.

Chandler has fibromyalgia.  Id. at 51. She has muscle spasms and pain in different parts of her body when doing anything strenuous.  Id.  She also has severe right knee pain when first standing up and walking, and cannot stand for long periods of time.  Id.  She takes Librax for pain and omeprazole for stomach pain.  Id. at 52.

On a typical day, Chandler takes her daughter to school, visits with her grandmother, and goes back home.  Id.  She folds clothes and does laundry.  Id.  She uses a rolling cart to bring laundry to the laundry room.  Id.  She sometimes puts the dishes in the dishwasher.  Id.  Chandler sometimes shops and uses a wheelchair cart when she does. Id.  She testified her husband does most of the shopping.  Id. at 52-53.  She goes to church.  Id. at 53. Her husband does the yard work because she is not able.  Id.  Because she can stand or sit, she can do some household chores.  Id.  She does not vacuum.  Id.  Chandler testified vacuuming "throws my fibromyalgia" and starts pain in her arms and legs.  Id.

Chandler's hobbies and interests consist of reading novels and watching television.  Id. at 54.  Sometimes she uses a computer.  Id.  She can use a computer, an iPad, and a smart phone.  Id.  Chandler tries to read and cannot just sit and do nothing.  Id.

Chandler testified she can shower or bathe and dry her hair.  Id. She has a chair in her bathroom so she does not have to stand the whole time.  Id.  She must sit down and dry her hair.  Id.  Chandler testified she can take care of herself and dress herself.  Id. at 55.

Chandler testified she has sleep apnea and falls asleep easily. <u>Id.</u> She uses a CPAP machine but still gets sleepy during the day. <u>Id.</u> She has used a CPAP machine for about five years. <u>Id.</u> She has severe mood swings and cries a lot. <u>Id.</u> She has trouble focusing and forgets what she is doing. <u>Id.</u> Due to her dramatic mood swings, she is easily aggravated with other people. <u>Id.</u> at 56. Chandler testified she does not associate with a lot of people. <u>Id.</u> She has been this way for a couple of years, beginning after her son was killed. <u>Id.</u>

Chandler sees Dr. Kirkikis for Crohn's disease, Dr. Quillin for psychological issues, Dr. Brunet for her knee, Dr. English for psoriasis, Dr. Shoshay for her fasciitis, Dr. Gallaher as her general practitioner, Dr. Hajmurad for nerve pain and neuropathy, Dr. Shaleb for fibromyalgia, Dr. Foray for sleep issues, and Dr. England for her eyes. <u>Id.</u> at 56-57.

She was hospitalized in 2016 for an acute flare-up of Crohn's disease. <u>Id.</u> at 57. Chandler testified she was no longer taking Humira and began having problems with her Crohn's beginning in early 2016. <u>Id.</u> She could not afford Humira because she no longer had insurance. <u>Id.</u> at 57-58. After her hospitalization, she was able to restart Humira through an assistance program. <u>Id.</u> at 58. Chandler testified she was doing better with her Crohn's disease and not having diarrhea and nausea every day. <u>Id.</u>

Chandler testified she received counseling from Dr. Stokes, another psychologist with Dr. Quillin. <u>Id.</u> Chandler no longer sees Dr. Stokes because she cannot afford it. <u>Id.</u> She sees Dr. Quillin for medication management. <u>Id.</u> at 59. She

believes some of the medication causes blurry vision.  Id.  She has trouble reading and uses different pairs of glasses.  Id.  She did not know of other side effects of her different medications.  Id.

After her June 2016 hospitalization, Chandler went to Urgent Care for excruciating knee pain.  Id.  She then went to Dr. Brunet, an orthopedic doctor.  Id.  Chandler testified Dr. Brunet felt the knee swelling was arthritis and that there was not much she could do.  Id.  Chandler stated Dr. Brunet has not recommended any knee surgery.  Id.  She tries to exercise some, but not a lot because it is too painful.  Id. at 60.  She uses an elliptical machine at home, but usually only walks five to ten minutes.  Id.  She can stand in place for a couple of minutes.  Id.  She testified she is limited by pain in her knee and feet.  Id.  Sitting is okay unless her fistula flares up.  Id.  She cannot lift a box of copy paper but can lift a six-pack of Cokes or a gallon of milk.  Id. at 61.  She stated it hurts her stomach or legs to lift.  Id.

Chandler testified she tries to get along with people but does not see a lot of people.  Id.  She gets aggravated easily.  Id.  Chandler stated that she had trouble dealing with people at her job and got aggravated just talking with people.  Id. at 62.  She testified she can concentrate on instructions if it is written down in front of her.  Id.  If something requires longer concentration, she drifts off or must get up and go to the bathroom.  Id.  She loses her focus and has a hard time getting back to what she was doing.  Id.  at 63.

Chandler testified Crohn's disease is the main problem that keeps her from working.  Id. at 64.  Her second problem is focusing on the task at hand.  Id. at 64.

6

At the hearing, the ALJ and Chandler's attorney discussed Dr. Kirkikis opinion statement in which he discusses and circles some findings that track the irritable bowel disease, listing 5.06. Id. at 43. The ALJ notes that Dr. Kirkikis circles a couple of lab findings that would be consistent with that listing level severity – hemoglobin less than 10 grams per deciliter 60 days apart and albumin levels at less than 3.0 grams. Id. The ALJ could not find any hemoglobin low levels that were 60 days apart, and could not find any albumin levels that met that threshold. Id. Chandler's attorney noted that the lowest level of albumen he found was 3.1 grams, just above the threshold. Id. at 64. He found hemoglobin at level 8.2 on June 12 and 8.6 on June 9. Id. The ALJ noted that for the purpose of the listing analysis, the abnormal readings have to be separated by 60 days. Id. at 64-65. Chandler's attorney noted another low hemoglobin on May 11, 2016 at 9.7 grams. Id. at 65.

Chandler's attorney questioned her about her Crohn's disease. Id. Chandler testified her average day consists of stomach pain and diarrhea. Id. at 65-66. She goes to the bathroom with diarrhea three to five times on an average day. Id. at 66. Chandler stated she has nausea several times a week but not daily. Id. On a bad day, she has to go to the bathroom with diarrhea probably 12 to 15 times. Id. Chandler testified no matter what she is doing, she must leave, drop that task, and go to the bathroom. Id. Chandler wears adult diapers if she is having a bad day and must go somewhere. Id. She must stay close to a bathroom. Id. at 67. She often cannot make it to the bathroom in time. Id. Chandler testified she is often thinking

about when she will have to go to the bathroom next.  Id.  She stated her fistula is reoccurring.  Id.  Chandler has on average about two bad days in a week.  Id. at 68.

Chandler testified Dr. Shaleb diagnosed her fibromyalgia.  Id. at 68.  Dr. Shaleb sent Chandler to a neurologist for nerve conduction testing with Dr. Hajmurad.  Id.  Chandler testified that the nerve conduction study confirmed she had fibromyalgia.  Id.  She stated it is worse with exertion.  Id.  She has all over pain and tenderness all the time.  Id. at 69.  She has tenderness in her arms.  Id.  She has joint pain which she associates with arthritis and fibromyalgia.  Id.

Chandler testified Dr. Quillin diagnosed her with bipolar disorder and major depression.  Id. During a bout of depression, Chandler does not want to do anything and wants to be by herself at home. Id.  She does not want to be around family.  Id. She feels down a lot of the time.  Id. at 71.  She cries all the time.  Id.  She has anxiety and takes Abilify, Ativan, and Wellbutrin.  Id.  Sometimes she has panic attacks, which occur monthly and are triggered by environmental stressors.  Id.  During bouts of depression, she has trouble maintaining focus and completing tasks.  Id. at 72. This occurs three or four times a week.  Id.  She also has issues sleeping during the day.  Id.  If she must travel, her husband always drives so she is not driving any distances by herself.  Id.

Regarding her ability to work, Chandler testified that Dr. Kirkikis said her bouts of diarrhea, stomach pain, and nausea would probably prohibit her from maintaining a job.  Id. at 73.  Dr. Kirkikis estimated she would be absent from work more than once a week due to her issues.  Id.  Chandler testified Dr. Quillin stated

that not focusing prohibited her from working.  Id.  Chandler used to enjoy work but became overwhelmed, would cry, and feel bad about coming to work every day.  Id. Without her issues, she felt she would be working.  Id.

The VE did not need any clarification regarding Chandler's past work.  Id. at 74.  The ALJ asked the VE to characterize Chandler's past work history.  Id.  The VE testified that during her 20 years at the credit union, Chandler performed the job of financial institution manager, DOT[1] number 186.167-086, skilled work, SVP level 8, physical demand level sedentary.  Id.  The VE testified Chandler also performed the job of collection and credit manager, DOT number 169.167-086, skilled work, SVP level 8, physical demand level sedentary.  Id. at 74-75.  She also performed the job of head teller, DOT number 211.132-010, skilled work, SVP level 8, physical demand level light.  Id. at 75.  The characterizations given were both as generally performed and as she actually performed that work.  Id.

The ALJ asked the VE to assume a hypothetical individual with the same age, education, and past work experience as Chandler with the following limitations:  light work; lifting and carrying 20 pounds occasionally, ten pounds frequently; standing and walking for up to six hours in an eight-hour day; sitting for up to six hours in an eight-hour day; occasional climbing of ramps and stairs, but no climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; no exposure to hazards such as unprotected heights and dangerous moving machinery; no exposures to extremes of heat or cold; limited to simple, routine,

---

[1] Dictionary of Occupational Titles.

repetitive work; limited to simple work-related decisions; and only frequent interaction with supervisors and coworkers and only occasional interaction with the public. Id. at 75-76. The ALJ asked the VE if, based on those limitations, whether that hypothetical individual could perform any of Chandler's past work. Id. at 76.

Regarding the ALJ's hypothetical, the VE testified there was no past work available to that individual. Id. The ALJ inquired about the sedentary work Chandler performed as a credit manager and financial institution manager and what limitations in the hypothetical preclude Chandler's past work. Id. The VE testified that occasional contact with the public primarily precludes past work as Chandler had frequent to constant contact with the public. Id. The VE stated that Chandler's past work was highly skilled work, all SVP level 8. Id. The VE stated that the hypothetical required unskilled, simple work-related decisions and Chandler performed past jobs that were highly skilled and required her to make complicated decisions. Id. at 76-77.

The VE testified that there are other jobs in the national economy that such a person could perform. Id. at 77. The VE stated that the individual with such limitations could work as a price marker, DOT number 209.587-034, unskilled work, SVP level 2, exertional level light (273,000 jobs in the national economy). Id. The VE testified the individual could work as a housekeeper, DOT number 323.687-014, unskilled work, SVP level 2, physical demand level light (137,000 jobs in the national economy). Id. The VE further testified that the individual could work as a cafeteria

attendant, DOT number 311.677-010, unskilled, SVP level 2, physical demand level light (60,000 jobs in the national economy). Id.

The ALJ asked the VE to assume the hypothetical individual is exertionally limited to sedentary work with essentially the same non-exertional limitations as before. Id. at 78. The ALJ asked the VE to assume the following limitations: lifting and carrying 10 pounds occasionally, five pounds frequently; standing and walking for up to two hours in an eight-hour day; sitting for up to six hours in an eight-hour day; occasional climbing of ramps and stairs, but no climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; no exposure to hazards such as unprotected heights and dangerous moving machinery; no exposures to extremes of heat or cold; limited to simple, routine, repetitive work; limited to simple work-related decisions; and only frequent interaction with supervisors and coworkers and only occasional interaction with the public. Id. at 75-76. The ALJ asked the VE if, based on those limitations, whether that hypothetical individual could perform any of Chandler's past work. Id.

Regarding the ALJ's second hypothetical, the VE testified there was no past work available to that individual. Id. The VE asked some clarifying questions to determine whether jobs would be available in the national economy to that individual. Id. at 79. The ALJ clarified that the limitation of occasional public contact includes telephone contact with the public. Id. The VE testified that there are other jobs in the national economy that such a person could perform. Id. The VE testified that the individual could perform work as a document specialist, DOT number

249.587-018, unskilled, SVP level 2, physical demand level of sedentary (73,000 jobs in the national economy). Id. The VE also testified the individual could work as a surveillance system monitor, DOT number 379.367-010, unskilled work, SVP level 2, physical demand level sedentary (17,000 jobs in the national economy). Id.

The ALJ asked the VE to assume those same limitations, except that due to various physical and mental limitations, the individual would need at least two additional breaks other than the normal workday breaks, each a 15-minute duration; would be absent at least two days or more per month; and would be off task at least 20 percent of the workday. Id. at 79-80. The VE testified that the third hypothetical would eliminate all jobs in the national economy for the individual. Id. at 80. That is true for the individual limitations, both individually and collectively. Id.

Chandler's attorney asked the VE to assume in the first hypothetical that the individual's condition markedly limited her ability to perform activities within a schedule and maintain regular attendance within customary tolerances. Id. The VE testified that no unskilled jobs would be available in the national economy with that limitation. Id. at 81. Chandler's attorney asked the VE to assume in the first hypothetical that the individual had to be allowed to take unscheduled breaks for regular durations up to 10 times a day. Id. The VE testified no jobs would be available to that individual in the national economy. Id.

### B. ALJ's Findings

To determine disability, the ALJ applied the five-step sequential process outlined in 20 C.F.R. § 404.1520(a). The sequential process required the ALJ to

determine whether Chandler: (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See Greenspan, 38 F.3d at 237.

Here, the ALJ found Chandler met the insured status requirements of the Act through December 31, 2019. (Doc. 13-1, p. 23).  The ALJ found that Chandler had not engaged in substantial gainful activity since September 16, 2015, the alleged onset date. Id.  In step two and three of the sequential evaluation, the ALJ determined Chandler suffered severe impairments of lumbar degenerative disc disease at L5-S1; right patella chondromalacia; Crohn's disease; depression; anxiety; bipolar disorder; and obesity.  (Doc. 13-1, pp. 23).  But the ALJ concluded Chandler did not have an

impairment or combination of impairments severe enough to meet or medically equal the severity of any of the listed impairments in Appendix 1. (Doc. 13-1, p. 25).

After consideration of the record, the ALJ determined Chandler retained the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a), except she was limited to no more than occasional climbing of ramps/stairs; no climbing of ladders, ropes, or scaffolds; no more than occasional balancing, stooping, kneeling, crouching, and crawling; and no exposure to extremes of heat/cold. (Doc. 13-1, p. 25). The ALJ found Chandler was limited to simple, routine, repetitive work; simple work-related decisions; no more than frequent interaction with supervisors and coworkers; and no more than occasional interaction with the public. Id.

The ALJ concluded Chandler's RFC precluded her from performing past relevant work. (Doc. 13-1, p. 32). The ALJ found that Chandler – age 42 on the alleged disability onset date – was a younger individual with a high school education and the ability to communicate in English. (Doc. 13-1, p. 32). Transferability of job skills was not material to the ALJ's determination of disability because he found that using the Medical-Vocational Rules as a framework supported a finding that Chandler was "not disabled." (Doc. 13-1, p. 32).

The ALJ also determined that, considering Chandler's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Chandler could perform. (Doc. 13-1, p. 32). The ALJ had the VE testify regarding jobs with Chandler's age, education, work experience, and RFC. (Doc. 13-1, p. 33). The VE testified that given all the factors, the individual would be

14

able to perform the requirements of representative occupations such as document specialist with 73,000 jobs nationally, and surveillance system monitor, with 17,000 jobs nationally. (Doc. 13-1, p. 33).

The ALJ found that under Social Security Ruling ("SSR") 00-04p, the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles, and Chandler could make a successful adjustment to other work that exists in significant numbers in the national economy. (Doc. 13-1, p. 33). The ALJ concluded that Chandler had not been under a disability, as defined in the Act, from September 16, 2015, through the date of his decision. (Doc. 13-1, p. 33).

## II.    Law and Analysis

### A.    Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. § 405(g) to a determination of whether "substantial evidence" exists in the record to support the Commissioner's decision, and whether there were any prejudicial legal errors. See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the

evidence must take into account whatever in the record fairly detracts from its weight.  See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than a court.  See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  A court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  See Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See Johnson v. Bowen, 864 F.2d 340, 344 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## B.    The ALJ properly relied on the VE's testimony at Step 5 of the sequential evaluation.

The ALJ noted that in determining whether a claimant may make a successful adjustment to other work, he must consider the claimant's RFC, age, education, and work experience in conduction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. Id. at 32.  The ALJ noted that if a claimant had the RFC to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.28.  Id.  at 33.  The ALJ found that

Chandler's ability to perform all or substantially all of the requirements of this level of work were impeded by additional limitations. Id.

To determine the extent to which those limitations eroded the unskilled sedentary occupational base, the ALJ had an impartial VE testify whether jobs exist in the national economy for an individual with Chandler's age, education, work experience, and RFC. Id. The VE testified that given all of the factors, the individual would be able to perform the unskilled sedentary jobs of document specialist (73,000 jobs in the national economy) and surveillance system monitor (17,000 jobs in the national economy). Id. at 33, 79.

The ALJ determined that, in accordance with SSR 00-4p, the VE's testimony was consistent with the information contained in the DOT and other accepted sources. (Doc. 13-1, p. 33). The ALJ concluded that, based on the VE's testimony and considering Chandler's age, education, work experience, and RFC, Chandler could make a successful adjustment to other work that exists in significant numbers in the national economy. Id. at 33. Thus, the ALJ stated a finding of "not disabled" is appropriate. Id.

At step five of the sequential process, the Commissioner bears the burden of proof establishing the claimant can perform work existing in significant numbers in the national economy. 20 C.F.R. § 404.1560(c). The use of a VE is discretionary. See 20 C.F.R. § 404.1566(e). If, however, the claimant suffers from non-exertional impairments, the Commissioner must rely on a VE to establish that suitable jobs exist in the economy. Newton v. Apfel, 209 F.3d 448, 458 (5th Cir. 2000). "Vocational

testimony that a claimant can perform a number of jobs suited to his capabilities satisfies the Commissioner's burden of showing that the claimant is not disabled." Halterman *ex rel.* Halterman v. Colvin, 544 Fed.Appx. 358, 361 (5th Cir. 2013) (citing Fortenberry v. Harris, 612 F.2d 947, 950 (5th Cir. 1980)).  Once the Commissioner finds jobs in the national economy are available to the claimant, the burden of proof shifts back to the claimant to rebut that finding.  Id. (citing Fraga v. Bowen, 810 F.2d at 1302); see also Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).

Chandler relies on the VE testimony based on additional hypotheticals that there are no jobs she could perform.  (Doc. 14, p. 1).  Chandler argues that at the end of the VE questioning the VE felt an employer would not hire her with her conditions. Id.  The ALJ asked the VE in a third hypothetical to assume an RFC based on an individual who could perform sedentary work with non-exertional limitations, except that due to various physical and mental limitations, the individual would need at least two additional breaks other than the normal workday breaks, each a 15-minute duration; would be absent at least two days or more per month; and would be off task at least 20 percent of the workday.  Id. at 79-80.  The VE testified that the third hypothetical would eliminate all jobs in the national economy for the individual. Id. at 80.

However, an ALJ may reject a VE's hypothetical testimony when the assumptions posed to the VE are not supported by the record.  Owens v. Heckler, 770 F.2d 1276, 1282 (5th Cir. 1985).  The ALJ found that the evidence supports his conclusion that despite her impairments, Chandler retained the capability to perform

work on a regular and continuing basis at all times relevant at a greatly reduced exertional and non-exertional level.   (Doc. 13-1, p. 28).   He concluded that her condition limits her to no more than sedentary exertional work activity subject to the non-exertional restrictions found in the RFC to accommodate her functional deficits. Id.  The ALJ stated the objective medical and opinion evidence otherwise provides no basis for finding limitations greater than those.  Id.

Since the hypothetical questions need only include limitations accepted by the ALJ, it is insignificant that the ALJ rejected the VE's testimony regarding the additional limitations in reaching his decision.  Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994); Owens, 770 F.2d at 1282 (concluding that an ALJ's rejection of expert testimony was reasonable where "objective medical evidence did not coincide with the hypothetical assumptions posed to the vocational expert").   Here, the record demonstrates the ALJ's hypotheticals to the VE incorporated the disabilities of Chandler recognized by the ALJ, and Chandler's attorney had the opportunity to correct any deficiencies in the ALJ's question.  Boyd v. Apfel, 239 F.3d 698, 707 (5th Cir. 2001); Bowling, 36 F.3d at 436.  Thus, substantial evidence supports the ALJ's conclusion that Chandler is capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and his findings are entitled to deference.

C.    **The ALJ's determination of Chandler's RFC was proper.**

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." Perez v. Heckler, 777 F.2d 298, 302 (5th

Cir. 1985). The ALJ's RFC decision can be supported by substantial evidence even if the ALJ does not specifically discuss all the evidence that supports his or her decision or all the evidence that he or she rejected. Falco, 27 F.3d at 163-64. A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. Johnson, 864 F.2d at 343; Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995). A court "may only scrutinize the record" and consider whatever fairly detracts from the substantiality of the evidence supporting the ALJ's decision. Leggett, 67 F.3d at 564. Accordingly, a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings to support the ALJ's decision. Johnson, 864 F.2d at 343-44.

Because the treating physician is most familiar with the claimant's impairments, his opinion should be accorded great weight in determining disability. See Giles v. Astrue, 433 Fed. Appx. 241, 246–47 (5th Cir. 2011) (citing Newton, 209 F.3d at 455). If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight." See Giles, 433 Fed. Appx. at 246-47 (citing 20 C.F.R. § 404.1527(d)(2)). Likewise, when a treating physician has reasonable knowledge of the impairment, his opinion is given more weight than an opinion from a non-treating physician. See id. Treating physicians' opinions also receive greater weight "[w]hen

the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment." <u>See</u> <u>id.</u>

However, the Commissioner may give less weight to a treating physician's opinion about a condition outside his area of expertise. <u>See</u> <u>id.</u> The ALJ need not given the treating physician's legal conclusions – such as statements that the claimant is "disabled" or "unable to work" – any special weight or significant. <u>Frank v. Barnhart</u>, 326 F.3d 618, 620 (5th Cir. 2003) (citations omitted). Where the opinion of the claimant's treating physician is "brief and conclusory . . . or otherwise unsupported by the evidence," the ALJ is not required to afford it controlling weight. <u>Perez</u>, 415 F. 3d at 465-66 (quoting <u>Greenspan</u>, 38 F.3d at 237). Responses to a "questionnaire format" are characterized as "typi[cally] 'brief or conclusory' testimony" when they lack "explanatory notes" or "supporting objective tests and examinations." <u>Foster v. Astrue</u>, 410 Fed.Appx. 831, 833 (5th Cir. 2011).

An ALJ "may reject the opinion of the treating physician *only* if the ALJ performs a *detailed analysis* of the treating physician's views under" the factors set out in 20 C.F.R. 404.1527 and 416.972. <u>See</u> <u>Beasley v. Barnhart</u>, 191 Fed. Appx. 331 (5th. Cir. 2006) (emphasis in original); <u>see also</u> <u>Giles</u>, 433 Fed. Appx. at 246. Under the regulations, an ALJ is required to consider the physician's length of treatment of the claimant, the physician's frequency of examination, the nature and extent of the treatment relationship, the support of the physician's opinion that is afforded by the medical evidence of record, the consistency of the opinion with the medical record,

and finally, the physician's specialization. See Newton, 209 F.3d at 456; 20 C.F.R. § 404.1527(c); 20 C.F.R. § 416.927(c).

Moreover, the Fifth Circuit has recognized that an ALJ "is not required to give controlling weight to a treating physician opinion when that opinion is contradicted by examining physician evidence." Walker v. Barnhart, 158 Fed.Appx. 534, 535 (5th Cir. 2005) (quoting Newton, 209 F.3d at 458). The Fifth Circuit does not require consideration of each of the six factors set out in Newton when "'there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another.'" Id.

Here, the ALJ considered all of the relevant evidence to determine Chandler's RFC. (Doc. 13-1, pp. 23-28); SSR 96-8P, 1996 WL 374184, at *5 (July 2, 1996). The ALJ carefully summarized Chandler's testimony and medical evidence of record and explained how he weighed the evidence. (Doc. 13-1, pp. 21-34). The ALJ considered all relevant evidence in the case record, including Chandler's medical history, medical signs and laboratory findings, Chandler's activities of daily living, the effects of her symptoms, the effects of treatment, recorded observations, and medical source statements. (Doc. 13-1, pp. 25-32).

The ALJ noted Chandler's testimony that she is able to do some household chores, pick up her children from school, visit with her grandmother occasionally, and shop with a motorized cart. (Doc. 13-1, p. 26). She testified she has a few friends she socializes with; can read, use an iPad or computer, watch television, talk on the phone; and perform personal hygiene tasks. Id. He noted that on her Function

Report, she takes care of pets, prepares quick and easy meals, does laundry, uses the dishwasher, goes outside daily, shops in stores, handles money, drives, reads, spends time with others, and drives her daughter to cheerleading practice. Id.

After consideration of the entire record, the ALJ found Chandler has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a), except for no more than occasional climbing of ramps or stairs; no climbing of ladders, ropes, or scaffolds; no more than occasional balancing, stooping, kneeling, crouching and crawling; no exposure to hazards such as unprotected heights and dangerous, moving machinery; and no exposure to extremes of heat and cold. Id. at 26. The ALJ also found Chandler was limited to simple, routine, repetitive work; simple, work-related decisions; no more than frequent interaction with supervisors and coworkers; and no more than occasional interaction with the public. Id.

In determining the RFC, the ALJ noted that an individual's RFC is the "ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." Id. at 22. In doing so, he considered all Chandler's impairments, including those that are not severe, based on 20 C.F.R. §§ 404.1520(e) and 404.1545 and SSR 96-8p. Id. The ALJ found Chandler had the following severe impairments: lumbar degenerative disc disease at the L5-S1; right patella chondromalacia; Crohn's disease; depression; anxiety; bipolar disorder; and obesity. Id. at 23. He determined Chandler's impairments of carpal tunnel syndrome, restless

leg syndrome, obstructive sleep apnea, fibromyalgia, chronic pain syndrome, vision problems, rheumatoid arthritis were non-severe under the Act. Id. at 23-24.[2]

Chandler's medical record evidence shows a normal physical exam and normal right wrist X-ray relating to right wrist pain in December 29, 2012. Id. at 272-283. She received physical therapy in March of 2013 through April 23, 2013 for right wrist pain. Id. at 262-268. She reported she saw Dr. Brunet and Dr. Garrison and x-rays were negative for fracture, but ultrasound showed fluid and inflammation at the right wrist. Id. On April 23, 2013, Chandler was discharged upon reporting she was released from further therapy by her physician. Id. at 262. A July 3, 2013 MRI revealed a multiloculated ganglion cyst adjacent to the ventral aspect of the radius, and on the ulnar aspect on the ventral surface of the triangular fibrocartilage styloid insertion. Id. at 260, 276-77. A July 16, 2013 physical exam by Dr. Brunet revealed full wrist motion, mildly tender over the ulnar side of the wrist and forearm, no tenderness over the volar aspect of the wrist, and no masses noted. Id. at 259-260. Dr. Brunet noted her pain seemed to be more generalized tendinitis in the proximal aspect of the forearm. Id.

Dr. Brunet treated Chandler's right knee pain on October 30, 2014. (Doc. 13-1, p. 256). Dr. Brunet noted Chandler was overweight; had a normal alignment; full range of motion; hyperflexion increased soreness or pain in her knee; active flexion

---

[2] Although neither Chandler nor her attorney asserted her condition meets or exceeds any listed impairment under Appendix 1, the ALJ considered whether the records supported a finding of a listing level impairment for musculoskeletal, digestive, or mental impairments. (Doc. 13-1, p. 25). The ALJ found that the medical evidence of record did not support a listing level impairment. Id.

revealed crepitation retopatellarly; 5cc effusion was evident; and she still had lot of patellar femoral crepitation. Id. Dr. Brunet's impression was chondromalacia of the patella with an effusion from overuse, contributed to by being overweight. Id. at 258. Dr. Brunet recommended straight leg raises, ice, Aleve, and follow-up if no improvement. Id. On a November 20, 2014 follow-up with Dr. Michael E. Brunet for knee pain, physical exam was essentially the same. (Doc. 13-1, p. 253). Dr. Brunet ordered an MRI and follow-up. Id. at 255.

Regarding her right knee pain, the ALJ noted a December 2014 MRI revealed mild chondral changes but nothing suggesting surgery. Id. at 26, 255. On December 4, 2014, Dr. Brunet diagnosed chondromalacia of patella and recommended weight loss, exercise, and to follow-up as needed. Id.

A December 8, 2014 visit with Dr. Hajmurad showed an essentially normal physical exam with some tenderness in the knee. Id. at 329. On April 2, 2015, on follow-up with Dr. Brunet for continued right knee pain, exam revealed full range of motion of the knee, painful patella compression, and pain at the lateral facet of the patella. (Doc. 13-1, pp. 247-48). His impression was chondromalacia of the patella with metatarsalgia, and he recommended weight loss, physical therapy, Z-coil shoes, and to follow-up in a month. Id.

On May 18, 2015, Chandler followed-up with Dr. Riad Hajmurad, reporting Neurontin has helped her mild neuropathy and fibromyalgia. Id. at 325. Dr. Hajmurad's impression was fibromyalgia, carpal tunnel syndrome, neuropathy, and restless leg syndrome. Id. at 326.

Chandler treated with Dr. James Quillin and Dr. Lauren Stokes starting in September of 2015 for psychotherapeutic management of depression and grief. (Doc. 13-1, pp. 304-318). Dr. Quillin's initial evaluation on September 4, 2015 noted Chandler's sleep and appetite were intact, her energy was limited, her interest level and social interaction were limited, and she had copious crying spells. Id. at 311. She reported having trouble at work, felt like blowing up a lot, made a lot of mistakes, felt distracted, and had difficulty with her concentration. Id. Dr. Quillin's mental status examination revealed Chandler was alert, friendly, and cooperative and was casually and neatly dressed. Id. at 312. She was oriented in all spheres, attention by digits recall was normal with seven correctly reproduced, and concentration on simple vigilance testing was intact with no errors noted. Id. Remote memory was good and immediate recall was clinically adequate. Id. She was coherent in her thoughts, her affect was intact, and her mood was depressed. Id. Her insight and judgment function were adequate. Id. Dr. Quillin's impression was major depression, single episode, moderate; rule out possible cyclothymia. Id. Dr. Quillin recommended PAI[3] for an objective evaluation of Chandler's psychiatric status; counseling with Dr. Stokes; adjustments to psychopharmacologic protocol after her PAI, and follow-up care. Id.

On September 21, 2015, Dr. Stokes noted Chandler had struggled with depression since the loss of her son in a motor vehicle accident two years prior and her husband's infidelity. Id. at 318. Dr. Stokes saw Chandler for behavioral

---

[3] Personality Assessment Inventory.

activation and relaxation training. Id. Dr. Stokes noted Chandler stated she lost her job due to some personality conflicts and overstepping on her part. Id. She reported she was "not opting to pursue employment at this time instead focusing on her health." Id. Dr. Stokes's impression was major depression, single episode, moderate; rule out possible cyclothymia. Id.

On September 23, 2015, Dr. Quillin reviewed Chandler's PAI which showed substantial depression, anxiety, and some posttraumatic features with somatization. Id. at 309. Dr. Quillin could not rule out borderline traits, but noted possible bipolar disorder type 2 features. Id. Dr. Quillin found her affective instability noteworthy. Id. He gave samples of Latuda for mood stabilization and depression. Id.

Chandler also saw Dr. Hajmurad on September 23, 2015 for restless leg syndrome. Id. at 322. She reported doing well on Mirapex. Id. She also reported Neurontin was helping with her fibromyalgia and neuropathy. Id. Chandler reported more problems with her hand related to mild carpal tunnel syndrome. Id. However, a nerve conduction sensory study in her right hand was normal. Id. at 322, 332. Dr. Hajmurad found no evidence of carpal tunnel syndrome in the right hand. Id. His objective physical exam of Chandler was essentially normal. Id. at 322-23. His impression was fibromyalgia, mild carpal tunnel syndrome and neuropathy, and restless leg syndrome. Id. at 323.

On September 28, 2015, Chandler reported to Dr. Stokes that she was feeling better from starting behavioral activation and was able to do some things with friends and get out of the house more. Id. at 317. On October 12, 2015, Dr. Stokes observed,

and Chandler reported, behavioral activation was helpful to her moods.  Id. at 316. Dr. Stokes noted possible bipolar disorder type 2, and recommended follow-up on relaxation training and progressive muscle relaxation.  Id.

On October 15, 2015, Dr. Quillin noted Chandler was doing better, her moods were more stable, and she was less depressed.  Id. at 308.  Dr. Quillin noted she responded well to psychotherapeutic support.  Id.  Chandler felt she was doing better and did not want to make any changes in her medication. Id.

On November 4, 2015, Chandler reported to Dr. Stokes that deep breathing had not been significantly helpful.  Id. at 315.  On November 12, 2015, Dr. Quillin noted Chandler was doing a little better with her moods but could not afford Latuda. Id. at 306. Dr. Quillin prescribed Abilify as an alternative. Id.  Dr. Quillin noted Chandler responds well to supportive cognitive behavioral therapy.  Id.  He noted her major depression and possible bipolar disorder type 2 were both stable. Id.

On November 18, 2015, Dr. Stokes noted Chandler's major depression was improving and possible bipolar disorder type 2 was stable.  Id. at 314.  On December 16, 2015, Chandler reported feeling better with a combination of medications and taking time for herself.  Id. at 313.  She reported she was in a better place and able to get through the anniversary of her son's death.  Id.  Chandler requested that she not return for treatment on an ongoing basis, but she wanted to follow-up after Dr. Stokes returned from maternity leave.  Id.  Chandler continued medication management with Dr. Quillin. Id.

On December 16, 2015, Chandler reported to Dr. Quillin that she was feeling better on Abilify and that others around her notice a "very positive change." Id. at 304. Dr. Quillin noted Chandler's major depression was clinically and subjectively improving and possible bipolar disorder type 2 was stable. Id.

The ALJ found that Chandler's February 1, 2016 lumbar MRI showed multilevel spondylosis but not significant stenosis or nerve impingement, and only mild progression of facet arthropathy at L5-S1. Id. at 26, 446. On that date, Dr. Hajmurad also performed an EMG and nerve conduction study which showed mild S1, but no evidence of neuropathy. Id. at 437. Also, a nerve conduction study of the right arm was normal with no evidence of carpal tunnel syndrome. Id. Notably, physical exam revealed Chandler was alert, awake, had clear mental status and normal speech, followed commands properly, oriented to time, place, and person, with no evidence of aphasia. Id. at 438. She had good range of motion in both upper and lower extremities, no focal atrophy or fasciculations, good tone, no spasticity or increased tone, good strength, down-going toe bilaterally, no posture, and normal gait. Id. The ALJ made note of Dr. Hajmurad's normal findings. Id. at 26.

Chandler reported feeling a lot better on February 11, 2016 with Dr. Quillin. Id. at 492. He again noted she responded well to support, and that she is handling things a lot better now. Id. Chandler reported her medication was very effective. Id. She stated she takes Ativan less frequently and was dealing with stress more effectively. Id. Dr. Quillin's noted her major depression, single episode, moderate

was clinically and subjectively improved to more stable. Id.  He also noted her probable bipolar disorder type 2 was stable. Id.

Chandler called in to Dr. Kirkikis on February 22, 2016 reporting she no longer had two forms of insurance and was not working. Id. at 467.  She stated she could no longer afford Humira.  Id.  Dr. Kirkikis prescribed Budesonide and Azulfidine. Id.

On April 14, 2016, Chandler reported more anxiety to Dr. Quillin. Id. at 490. She felt her current dose of Ativan was not helping. Id.  Dr. Quillin prescribed a higher dose of Ativan. Id.  He noted she is having near panic features that don't quite escalate to panic symptomatology. Id.  He prescribed Trazodone for her reports that she is not sleeping.  Id.  His impression was major depression, single episode, moderate; probable bipolar disorder type 2; and substantial anxiety.  Id.

On follow-up with Dr. Hajmurad on April 18, 2016, he noted she has disc disease at the L5-S1 on the MRI and EMG, with no evidence of neuropathy. Id.  On physical exam he found Chandler was alert, awake; had clear mental status and normal speech; followed commands properly; and was oriented to time, place, and person, with no evidence of aphasia.  Id. She had normal sensation to pinprick and no sensory level present. Id. at 435.  She had good range of motion in both upper and lower extremities, no focal atrophy or fasciculations, good tone, no spasticity or increased tone, good strength, down-going toe bilaterally, no posture, and normal gait.  Id. Dr. Hajmurad's impression was fibromyalgia, restless leg syndrome, and mild degenerative disease in the lumbar area.  Id.

Dr. Quillin completed a medical questionnaire on April 25, 2016 in which he opined Chandler was unable to obtain substantial gainful employment in the past twelve months due to her conditions, including depression, bipolar disorder, anxiety, Crohn's disease, fibromyalgia, chronic pain disorder, and sleep apnea. Id. at 335. Dr. Quillin opined that Chandler's conditions "markedly" limited her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from her psychologically based symptoms. Id. Dr. Quillin stated Chandler showed "marked" impairment in maintaining social functioning and maintaining persistence.  Id. at 336.  He stated there was no "marked" impairment in restriction of activities of daily living, maintaining concentration, and maintaining pace. Id. Dr. Quillin concluded that Chandler was disabled and unable to perform substantial gainful employment for the next twelve months. Id. He anticipated her impairments or treatment would cause her to be absent from work more than three times a month. Id.

The ALJ afforded evidentiary weight to Dr. Quillin's statement insofar as it states Chandler has severe mental impairments with some resulting functional deficits. Id. at 31. Otherwise, the ALJ gave no weight to Dr. Quillin's statement. Id. The ALJ found several problems with Dr. Quillin's medical source statement. Id. at 30. The ALJ noted the initial question called for an opinion on the effects of Chandler's physical limitations, which the ALJ determined to be outside the scope of Dr. Quillin's expertise as a psychologist. Id.; see Giles, 433 Fed. Appx. at 246-47

31

(citing 20 C.F.R. § 404.1527(d)(2)) ("[T]he Commissioner may give less weight to a treating physician's opinion about a condition outside his area of expertise."). He gave no weight to Dr. Quillin's opinion regarding Chandler's ability to obtain substantial gainful employment given her limitations. Id. The ALJ further found Dr. Quillin's responses were inconsistent in some respects with Dr. Quillin's own findings. Id. For example, the ALJ noted that Dr. Quillin indicated Chandler had no marked limits in attention, concentration, or pace. Id.

The ALJ gave little weight to Dr. Quillin's statement that Chandler was markedly impaired as to social functioning, maintaining a schedule, maintaining regular attendance, being punctual, and completing a normal workday without interruptions from psychological symptoms. Id. The ALJ determined that the "marked" functional deficits in the medical source statement are inconsistent with the medical record evidence of diagnoses of "moderate" depression and "stable" bipolar disorder at least until the condition change to "moderate to severe" in September of 2016. Id. He found Dr. Quillin's repeated notations that Chandler was improving inconsistent with "marked" limitations. Id.

The ALJ gave no weight to Dr. Quillin's statement that Chandler would have more than three absences per month because of her impairments and to attend treatment and that she would be unable to perform substantial gainful employment for the next 12 months. Id. The ALJ found the statements were legal conclusions reserved solely to the Commissioner and unsupported within the document itself and Dr. Quillin's visit notes. Id. The ALJ opined that Dr. Quillin's notes showed Chandler

was responding well to treatment and making clinical and subjective improvement. Id.

On May 16, 2016, Chandler reported to Dr. Quillin substantial depression with some mood swings, but her anxiety was a little better. Id. at 489. Dr. Quillin noted she responded well to supportive measures. Id. He increased her Abilify prescription and kept her on Ativan for anxiety. Id. On objective examination, a PHQ-9 questionnaire revealed a score of 15. Id. His impression was major depression, single episode, moderate to moderately severe; probable bipolar disorder type 2; and substantial anxiety. Id.

A May 22, 2016 physical exam for emergent care revealed Chandler was in no acute distress; alert; fully oriented; had normal mood and affect; intact memory; and full range of motion of all extremities. Id. at 392.

Chandler reported flare-up of Crohn's disease on May 25, 2016 to Dr. Kirkikis. Id. at 351. She had abdominal pain, nausea, vomiting, and multiple loose stools daily. Id. She reported she stopped taking Humira three to four months ago due to an insurance change. Id. She had been doing well on Azulfidine and Budesonide with as-needed Librax and until three weeks prior. Id. Dr. Kirkikis restarted her Humira due to Chandler finding assistance with payment. Id. She was given Prednisone for the flare-up, and pain medication. Id. The ALJ in his review took note of Dr. Kirkikis's instructions on this date for Chandler to exercise at least three times a week. Id. at 26. She was also told to watch caloric intake to lower her weight and improve her BMI. Id. at 351.

33

The ALJ considered Chandler's June 2016 hospitalization for flare-up of her Crohn's disease. Id. at 26-27. Chandler was hospitalized from June 6, 2016 to June 14, 2016 for exacerbation of Crohn's disease. Id. at 339-48. The ALJ noted this was after being off Humira, and noted Dr. Kirkikis recommended in that same month to exercise at least three times a week. Id. at 27.

During her hospitalization, Dr. John Gosserand was consulted related to Chandler's history of Crohn's. Id. at 384. Chandler reporting her husband's changed insurance and she was unable to get her Humira prescription. Id. She reported she was scheduled to start Humira after working with the Humira company for approval. Id. With the flare-up, she reported several loose stools per day, intermittent mid-abdominal cramping, a 16-pound weight loss, and blurred vision the last two weeks. Id. Chest x-rays were normal. Id. at 414-417. An abdomen CT showed no acute findings. Id. at 418. A head CT showed no acute intracranial process. Id. at 420. Upon discharge, she was instructed regarding a Crohn's diet and to exercise daily. Id. at 339-48.

The ALJ considered that the discharge instructions stated Chandler should avoid extreme temperatures and exercise daily. Id. at 27. Her diagnosis was acute exacerbation of Crohn's disease. Id. at 380. It was noted Chandler felt this was due to her not being able to take Humira over the past year. Id. A discharge exam revealed she was alert, oriented, in no apparent distress, normal affect, obese, and left upper and middle abdominal pain. Id.

On a June 27, 2016 follow-up after hospitalization, Chandler reported she had Humira shots but had not started them. Id. at 453.  She denied dysphagia, vomiting, regurgitation, pyrosis, fever, or significant weight loss. Id.  Dr. Kirkikis noted her condition was stable and physical exam was normal. Id. at 453-54.  Dr. Kirkikis assessed her with Crohn's disease, without complications; obesity; essential (primary) hypertension; and gastro-esophageal reflux disease without esophagitis.  Id. at 454. He refilled her Prednisone; instructed her to start Humira injections; and use Pepcid Complete for breakthrough acid reflux. Id.

On June 24, 2016, Chandler reported to Dr. Quillin she was doing better after flare-up of her Crohn's disease. Id.  at 487.  She reported Abilify and Ativan worked well, and her mood status was much improved. Id.  Dr. Quillin noted Chandler looked good clinically and responded well to support. Id.

Dr. Kirkikis's medical source statement dated June 29, 2016 opined that Chandler has been unable to engage in substantial gainful employment due to multiple problems resulting from Crohn's disease.  Id. at 373.  He opined that Chandler could lift and carry a maximum of less than ten pounds on both an occasional basis and frequent basis. Id.  He opined that Chandler showed no evidence of stenosis on endoscopy. Id. at 374.  He stated Chandler suffers from anemia with hemoglobin of less than 10 grams present on at least two evaluations at least 60 days apart, and serum albumin of three grams or less, present on at least two evaluations at least 60 days apart. Id. He concluded Chandler was disabled and unable to perform substantial gainful employment for at least the next twelve months.  Id.

The ALJ gave some weight to Dr. Kirkikis's opinion in that Chandler had some limitations from her Crohn's disease. Id. at 29. The ALJ noted these are accommodated within her RFC. Id. The ALJ found Dr. Kirkikis's statement was inconsistent with his own treatment records which showed Chandler's Crohn's flare-up had resolved with normal bowel movements after she resumed Humira. Id. at 29, 453-54. The ALJ also further found the statement inconsistent with Chandler's self-reports of significant improvement in her gastrointestinal symptoms with the medication. Id. Thus, the ALJ did not give this statement further evidentiary weight. Id.

The medical record evidence also shows that on August 5, 2016, Dr. Quillin noted Chandler was doing a little better. Id. at 486. He noted her mood status was still depressed but more stable. Id. He noted she responded well to support. Id. He prescribed Ativan and Abilify for anxiety. Id. On exam, a PHQ-9 questionnaire revealed a score of 16. Id. He noted her major depression, single episode, moderate to severe was clinically and subjectively improving but still symptomatic. Id. He assessed her with probable bipolar disorder type 2 and noted her substantial anxiety was more stable. Id.

On September 14, 2016, Dr. Hajmurad noted Chandler's MRI showed she had L5-S1 disc disease as suspected, as well as her EMG, with no evidence of neuropathy. Id. at 431. Dr. Hajmurad discussed the importance of her taking Humira to improve her condition. Id. She had swelling in her legs and edema. Id. Notably, physical exam showed Chandler was alert, awake, had clear mental status and normal speech,

followed commands properly, oriented to time, place, and person, with no evidence of aphasia. Id. She had good range of motion in both upper and lower extremities, no focal atrophy or fasciculations, good tone, no spasticity or increased tone, good strength, down-going toe bilaterally, no posture, and normal gait. Id. at 432.

The ALJ took note of Chandler's follow-up with Dr. Kirkikis in September 2016, which showed Chandler was having normal bowel movements and was again instructed to exercise. Id. at 27; 449. At this visit, she denied dysphagia, vomiting, regurgitation, pyrosis, fever, or significant weight loss. Id. Dr. Kirkikis noted her condition was stable and she had a normal physical exam. Id. at 449-50. His impression was that her Crohn's disease was without complications and stable. Id. at 450. He also noted generalized abdominal pain and obesity. Id. at 450. She was to continue Azulfidine and Humira and stop Prednisone. Id. She was to continue Librax for abdominal cramps and pain. Id. He instructed Chandler to exercise at least three times a week, watch caloric intake to lower her weight and improve her BMI, and check with her primary care physician for weight loss treatment plans. Id.

On September 23, 2016, Chandler reported to Dr. Quillin she was still somewhat depressed. Id. at 484. He added Wellbutrin SR 100 milligram and continued her on Abilify and Ativan. Id. He found her major depression, single episode, moderate to severe, was clinically and subjectively improving but still symptomatic. Id. His impression remained probable bipolar disorder type 2 and substantial anxiety more stable. Id.

Dr. Quillin's notes from October 14, 2016 reflect Chandler reported she was still depressed with angry outbursts. Id. at 482. Dr. Quillin found she presented as very calm and well controlled. Id. He found she has not had any problems with Wellbutrin SR and she reported her outbursts predated Wellbutrin. Id. Dr. Quillin noted her multiple other medications presented issues in including mood stabilizers and augmentation strategies. Id. Dr. Quillin discussed more frequent and intense counseling with Chandler which was not economically feasible for her. Id. He noted she responded well to supportive measures. Id. He strongly reinforced her reducing Ativan. Id. Dr. Quillin's impression was Major Depression, single episode, moderate to severe; probably bipolar disorder type; and substantial anxiety stable. Id. He prescribed Abilify; Wellbutrin SR; and Trazodone. Id.

Dr. Kirkikis's medical questionnaire dated October 25, 2016 opined that Chandler had been disabled from substantial gainful employment from September 16, 2015 to present. Id. at 495. However, the ALJ determined this statement was a "legal conclusion reserved to the Commissioner, and [was] unsupported by detailed clinical or diagnostic findings." Id. at 29. Thus, he afforded no weight to this opinion. Id.

Dr. Brunet's medical questionnaire dated November 2, 2016 opined that Chandler had the maximum ability to lift and carry on an occasional basis 10 pounds, and on a frequent basis less than 10 pounds, and the maximum ability to stand and walk (with normal breaks) about two hours in an eight-hour day, and to sit (with normal breaks) about six hours in an eight-hour day. Id. at 497-499. Dr. Brunet

opined Chandler's conditions restricted her activities of daily living and that she was disabled and unable to perform substantial gainful employment for the next 12 months. Id. at 498.  He felt he had an insufficient history in the past year to judge whether her condition would cause her to be absent from work.  Id.

The ALJ gave Dr. Brunet's medical source statement evidentiary weight since it supports the existence of some functional limitations consistent with exertional RFC for a limited range of sedentary work. Id. at 29.  However, the ALJ found that Dr. Brunet's statement that Chandler was disabled and unable to perform substantial gainful employment was unsupported and an unwarranted legal conclusion. Id.

The ALJ gave great weight to the state agency medical consultant's opinion that Chandler was not disabled.  Id. at 29, 95.  He considered this opinion as from a non-examining non-treating medical source. Id. at 29; see SSR 96-6P, 1996 WL 374180, at *1. The consultant found Chandler's RFC to be light work.  (Doc. 13-1, p 94). However, the ALJ determined the consultant's opinion regarding the mix of severe and non-severe impairments and Chandler's RFC was not consistent with the weight of the evidence, and he declined to give it significant evidentiary weight. Id.

Regarding Chandler's mental impairments, the ALJ considered Chandler's testimony that she has bipolar disorder, depression, and anxiety, with symptoms of mood swings, crying spells, irritability, intolerance for social interaction, two to three panic attacks a month, and trouble focusing or concentrating. Id. at 29.  He considered her treatment with Dr. Quillin and Dr. Stokes, psychologists, beginning in September

2015.  Id. at 30.  The ALJ noted diagnoses of major depression single episode moderate, and possible bipolar disorder type 2.  Id.  The ALJ noted Chandler felt better on Ability and after multiple counseling sessions, and that others around her had noticed a "very positive change." Id.  The ALJ observed Chandler was noted to respond well to support and treatment, clinically and subjectively. Id.  He also noted Chandler saw Dr. Quillin through the end of 2015 and in 2016, reporting depression and outbursts, but appearing as "very calm and controlled clinically." Id.  The ALJ noted Chandler was responsive to support and was able to handle things better. Id.

The ALJ followed 20 C.F.R. § 404.1520a in evaluating Chandler's mental impairments. Id. at 31. The ALJ found that the medical evidence of record indicates no more than a mild restriction in understanding, remembering, or applying information. Id.  The ALJ found that Chandler had moderate difficulties interacting with others.  Id.  He found that medical and other evidence of record reflected significant deficits in the ability to relate to and work with supervisors, co-workers, and the public; asking for help when needed; handling conflicts with others; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. Id.  Yet, the ALJ found Chandler engaged throughout the pendency of her claim in successful personal interaction with multiple individuals; had a good work record; and got along well with supervisors, and the public. Id. The ALJ included limitations in the RFC to no more than frequent interaction with supervisors and coworkers, and no more than occasional interaction

with the public, to minimize the potential effects of adverse symptoms to allowing functioning on the job notwithstanding her deficits. Id.

The ALJ noted Chandler had moderate difficulties with concentration, persistence, or pace. Id. He found that the medical evidence shows significant deficits in her ability to focus attention on work activities and stay on task, working at an appropriate and consistent pace, completing tasks in a timely manner, ignoring or avoiding distractions while working, and changing activities or work settings without being disruptive. Id. He concluded that any actual deficits are more limited in scope than asserted by Chandler. Id. The ALJ determined the evidence regarding the extent of her activities of daily living, occasions during which she denied such problems, and visits at which the clinical indications for such problems were negative were persuasive. Id. Thus, the ALJ included in the RFC restrictions from performing more than simple, routine, and repetitive work, and from making other than simple work-related decisions. Id.

The ALJ further found no more than mild impairment in adapting or managing oneself as the record reflects good response to treatment, self-reports of improvement of symptoms, and substantial beneficial effects of medication. Id. at 32. The ALJ declined to give significant evidentiary weight to the state agency psychological consultant, as it was inconsistent with the weight of the evidence. Id. It is axiomatic that the ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record. See Morris v. Bowen, 864 F.2d 333, 336 (5th Cir. 1988).

Regarding her physical impairments, while the ALJ found that Chandler's impairments combined to restrict her overall level of physical functioning, he determined that, based on the objective medical evidence and Chandler's allegations, the degree of restriction is not as great as urged. Id. at 27. The ALJ determined that Chandler's claim of the complete inability to work is not a true picture of her overall functionality. Id. The ALJ determined that despite Chandler's impairments, she retained the capability to work on a regular and continuing basis at all times relevant at a greatly reduced exertional and non-exertional level. Id. at 28. He found that a function-by-function analysis indicated Chandler's overall condition limited her to no more than sedentary exertional work activity, subject to the detailed non-exertional restrictions set forth in his finding which should adequately accommodate her functional deficits. Id. He found the objective and opinion evidence otherwise provides no basis for finding greater limitations. Id.

The ALJ considered clinical examinations in December 2014, May and September 2015, and June 2016 showing Chandler had good ranges of motion in the bilateral upper extremities, with good strength and normal gait, and no sensory deficits clinically. Id. at 27.

He considered that Chandler reported in June 2016 that Humira "worked really well" and blamed her flare-up on her inability to be on the medication for the previous year. Id. A condition that can reasonably be remedied by surgery, treatment, or medications is not disabling. Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987). However, a claimant's failure to follow prescribed medical treatment will

preclude an award of benefits only if the claimant lacks a good reason for failing to comply. 20 C.F.R. § 416.930; <u>Johnson v. Sullivan</u>, 894 F.2d 683, 685 n.4 (5th Cir. 1990). One such "good reason" is an inability to pay for the recommended treatment. SSR 16-3p, 2016 WL 1119029, at *8-9 (March 16, 2016); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1024 (5th Cir. 1990). However, the ALJ based his findings on factors other than non-compliance.

Here, the ALJ goes on to consider Chandler's weight readings from July of 2013 to November of 2016, noting Chandler's weight had been remarkably stable, except the summer of 2016. <u>Id.</u> at 27-28. He noted that although Chandler testified her weight had greatly fluctuated over time, the fact that her weight was stable despite her Crohn's disease suggests her condition had not been completely debilitating. <u>Id.</u> at 28. The ALJ found that Chandler's multiple physicians counseled her to engage in regular exercises (i.e. multiple times per week), which he found did not indicate Chandler's impairments were causing so much pain or functional limitation as to preclude such activity. <u>Id.</u> Additionally, the ALJ considered Chandler's testimony that she obtained unemployment benefits, which he found the application for and receipt of is inconsistent with the complete inability to work. <u>See</u> <u>Thibodeaux v. Astrue</u>, 324, Fed.Appx. 440, 444 (5th Cir. 2009).

The ALJ considered Chandler's longstanding physical problems stemming from her impairments and stated the objective medical evidence shows her symptoms waxed and wanted over time. (Doc. 13-1, p. 28). He determined Chandler suffered

major physical debilitation from the combination of her impairments and symptoms, noting adverse impacts on her abilities to stand, walk, lift, carry, and her posture. Id.

Applying SSR 02-01p, 2002 WL 34686281, at *5-6 (September 12, 2002)), the ALJ further considered the effect of her obesity on her functional capability. Id. He noted Chandler's excess weight had likely placed additional stress on her knees and lumbar spine. Id. at 28. He concluded that continued difficulties contributed significantly to the functional deficits reflected in the RFC, which he has considered. Id. The ALJ noted that his RFC for sedentary work which is highly restrictive reflects the amount of credit he gave Chandler. Id. at 29.

Here, the ALJ's resolution of conflicting evidence in the record is entitled to considerable deference. Vaughn v. Colvin, 589 Fed.Appx. 238, 242 (5th Cir. 2014) (citing Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001)). The ALJ resolves conflicts in evidence, not the Court. The ALJ's RFC assessment is supported by substantial evidence.

### D. New evidence submitted by Chandler is not material and does not support remand.

Chandler submitted new medical evidence to this Court on September 21, 2018 regarding current mental health treatment from August 29, 2018 to September 6, 2018. (Doc. 17, pp. 1-23). However, these documents do not form part of the administrative record. The Commissioner asserts Chandler's reliance on evidence regarding her current condition is misplaced and fails to establish remand is warranted. (Doc. 18, p. 9). The Commissioner argues that because Chandler's new

evidence shows, at most, subsequent deterioration of major depression, a previously non-disabling condition, it is not material evidence.  Id. at 10.

Under 42 U.S.C. Section 405(g) this Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  Thus, judicial review of the new evidence is limited to determining whether remand is appropriate.  Haywood v. Sullivan, 888 F.2d 1463, 1471 (5th Cir. 1989); Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

"Evidence that was 'not in existence at the time of the administrative . . . proceedings, meets the "new" requirement for remand . . . .'" Hunter v. Astrue, 283 Fed.Appx. 261, 262 (5th Cir. 2008) (quoting Haywood, 888 F.2d at 1471; accord Johnson v. Soc. Sec. Admin., 631 Fed.Appx. 260, 262-63 (5th Cir. 2016) (citations omitted). However, "[e]vidence which is merely cumulative of that already in the administrative record is not 'new' evidence that would support a remand under § 405(g)." See Pierre v. Sullivan, 884 F.2d 799, 803 (5th Cir. 1989); Bradley v. Bowen, 809 F.2d 1054, 1058 (5th Cir. 1987); accord Ferrari v. Astrue, 435 Fed.Appx. 314, 314-15 (5th Cir. 2010).

New evidence must also be material to be the basis for a remand. The "materiality inquiry requires determining whether the evidence relates to the time period for which the disability benefits were denied." Castillo v. Barnhart, 325 F.3d 550, 551-52 (5th Cir. 2003) (citing Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995);

accord Joubert v. Astrue, 287 Fed.Appx. 380, 383 (5th Cir. 2008). The new evidence cannot merely concern a subsequently acquired disability or the subsequent deterioration of a previously non-disabling condition. Garson v. Barnhart, 162 Fed. Appx. 301, 303 (5th Cir. 2006) (citing Leggett, 67 F.3d at 567); Ripley, 67 F.3d at 555, n. 14; Smith v. Apfel, 87 F.Supp.2d 621, 627 (W.D. La. 2000).  Further, "[f]or new evidence to be material, there must exist the 'reasonable possibility that it would have changed the outcome of the Secretary's determination.'" Hunter, 283 Fed.Appx. at 262 (citing Latham v. Shalala, 36 F.3d 482, 483 (5th Cir. 1994)).

The new records Chandler relies on and seeks to add cover a time period after both the ALJ's decision and after the Appeal's Council Decision.  (Doc. 17, pp. 1-23). The new evidence submitted shows Chandler's admission to Compass Behavioral Center of Alexandria for major depression on August 29, 2018 and discharge on September 6, 2018.  (Doc. 17, p. 1).  The records reflect the reason for admission as "suicidal/depression."  Id.  She was given instructions for follow-up care; a low fat, low sodium diet; and activity as tolerated.  Id. at 7.  Upon discharge, she denied suicidal or homicidal thoughts.  Id.  Her diagnosis was major depression and it was noted she had a history of rheumatoid arthritis, hypertension, hypothyroidism, and fibromyalgia.  Id. at 9.

The records show a continuation of treatment of Chandler's major depression but are not "material" in that there is nothing that indicates a "reasonable possibility that it would have changed the outcome" of the ALJ's determination.  See Hunter, 283 Fed.Appx. at 262 (quotations omitted) (citing Latham, 36 F.3d at 483).  The

records do not relate to the time period on or before the date of the ALJ's hearing decision.  Martinez v. Astrue, 252 Fed.Appx. 585, 587-88 (5th Cir. 2007); Ripley, 67 F.3d at 555, n.14.  And the records merely show a subsequent deterioration of Chandler's major depression, a previously non-disabling condition. Garson, 162 Fed. Appx. at 303. Thus, the new evidence submitted by Chandler does not warrant remand. See Ferrari, 435 Fed.Appx. at 315 (citing Haywood, 888 F.2d at 1471–72).

## III.  Conclusion

Because the ALJ applied appropriate legal standards and the ALJ's findings are based on substantial evidence in the record, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED, and that Chandler's appeal be DENIED and DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ.

P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __13th__ day of September, 2019.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE